## Richmond

## DEAN ALAN BRAINERD v. WILLIAM A. DICKINSON, MARY B. DICKINSON, HUGH L. PATTERSON AND DOUGLASS K. PATTERSON.

January 14, 1977.

Record No. 751493.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Poff, JJ.

*James R. McKenry (Aldine J. Coffman, Jr.; Penelope D. Coffman; Coffman & Coffman,* on brief), for appellant.

*Grover C. Wright, Jr.,* for appellees.

POFF, J., delivered the opinion of the court.

The dispute underlying this appeal grew out of an engineer's mistake in the preparation of a plat depicting a subdivision of 2.8

acres of land lying between Lake Shore Drive and Crystal Lake in Virginia Beach and owned by Mr. and Mrs. John Joseph Baecher.

A 1964 survey divided the tract into three lots, approximately equal in size, with the eastern boundaries fronting on the western shore of the lake. The survey was accurately marked on the ground with pins and colored streamers. The courses and distances stated on the plat, which was recorded on October 1, 1964, corresponded accurately with the survey, but the lines drawn on the plat were not true to scale and pictorially distorted both the courses and distances. The effect of the pictorial error was to portray both Site A on the north and Site C on the south as having more water frontage and greater areas than fixed by the survey, and to portray the intervening lot, Site B, as smaller with less water frontage. The survey and monuments on the ground gave Site B 110 feet of water frontage, with the lot extending approximately that width in a westerly direction from the water's edge a distance of 135 feet to a point where it became substantially wider. But by reason of the pictorial error, Site B appeared on the plat to have a water frontage of 77 feet. Current zoning ordinances established a building setback line of 20 feet on the side lines of the lot.

In the fall of 1965, appellant Dean Alan Brainerd expressed an interest in purchasing Site B but was told that the Baechers wanted to sell all three lots together. Brainerd contacted J. Richard Gormly and appellees William A. Dickinson and Mary B. Dickinson as potential purchasers of the other two lots. After considering the respective evaluations of the three lots suggested by Baecher and examining the recorded plat, Brainerd, Gormly, and Dickinson went upon the property and observed the pins and streamers. After the view, they agreed to adjust Baecher's evaluation by increasing the values of Site B and Site C and correspondingly reducing the value of Site A. The sales contract executed December 16, 1965 fixed the value of Site B at 32.46% of the purchase price, the value of Site A at 33.33%, and the value of Site C at 34.21%. Dickinson acquired title to Site C from the Baechers. Gormly, who acquired title from the Baechers to Sites A and B, later conveyed Site B to Brainerd and Site A to one Easton. Easton then conveyed Site A to appellees Hugh L. Patterson and Douglass K. Patterson. All of the several deeds

made reference to the recorded plat "for the size, location and dimensions" of the property conveyed.

The three original purchasers obtained permits for bulkheading the waterfront, and each paid his proportionate part of the per-foot cost based upon respective distances measured between the pins on the ground. Observing the setback lines as measured from the side lines pinned on the ground, Dickinson began construction of a house on Site C in 1968, and Brainerd cleared Site B and planted shrubbery in compliance with the side lines pinned on the ground. In the spring of 1973, while laying out the location of a house on Site A, Patterson discovered the pictorial error in the plat. The chancellor found that, until that time, none of the parties involved were aware of the error. Patterson completed his house within the setback lines measured from the pins on the ground.

When Brainerd began construction of a foundation on Site B, Dickinson and Patterson filed a bill of complaint against him praying "that the Court will reform the survey in such manner that the pins can be relocated on the ground . . . with the result that the property on the ground will carry out the intent shown on the original plat." Brainerd filed an answer and cross-bill seeking monetary damages.

By final decree entered August 22, 1975, incorporating a letter opinion dated July 15, 1975, the chancellor found from the evidence that "there was a mutual mistake of fact in that all parties hereto and their predecessors in title believed that the plat . . . accurately pictured the pin placements . . . but that the said parties did not . . . have such clearly defined impressions of lot deminsions [sic] as to enable the Court to say that the requested reformation would . . . more definitely reflect those impressions than does the recorded plat".

Upon that finding, appellees' prayer for reformation was denied.

The chancellor further found, however, that the three purchasers had reached an "understanding that the waterfront area of Site B would not be improved with structures, thereby maintaining an unobstructed view of the water front from the adjoining sites A and C" [hereinafter, the "understanding"]; that this "understanding" was "a prime consideration of said parties in the selection of the sites, the agreed values thereof, and the

agreements to purchase"; and that "equitable relief should be granted . . . in order to carry out the agreement". Based upon those findings, he ordered:

— that "a corrected plat, eliminating the graphic, scale or pictorial errors on the recorded plat, but maintaining the same courses and distances, should be prepared and recorded";

— that the corrected plat should reflect "a restriction prohibiting the erection or maintenance of any structure or structures, fence, hedge or other obstruction on that portion of Site B from the existing bulkhead westerly to a line parallel [or approximately so] thereto and approximately 150 feet therefrom";

— that Brainerd and "his successors in interest to Site B", be enjoined from violating that restriction; and

— that the parties should bear their respective costs.

Under a decree entered December 12, 1975, a plat dated September 22, 1975 correcting the pictorial error and containing a line across Site B labelled "The Building Setback Line" was recorded in the Clerk's office in Map Book 112, page 33. The location of Brainerd's house, which had then been completed, conformed to that restriction.

Appellant assigned error to the chancellor's factual findings, to the imposition of the restriction on the corrected plat and the corollary injunction, and to the apportionment of costs. Appellees assigned cross-error to the chancellor's denial of their prayer for reformation.

Considering first appellees' assignment of cross-error, we defer a ruling on the question whether the chancellor's finding of an "understanding" is supported by the evidence and assume that it is.

Appellees prayed for reformation of the survey on the grounds of a mutual mistake of fact. In effect, their position is that a mistake of fact among purchasers of lots shown on a plat resulting from pictorial errors in the plat, supersedes all other factors in determining the dimensions and configurations of the lots, and that a court of equity should, in the words of their prayer, "reform the survey in such manner that the pins can be relocated on the ground . . . with the result that the property on the ground will carry out the intent shown on the original plat."

This contention is a matter of first impression in this Court, and counsel have cited and we have discovered no helpful authority in other jurisdictions. However, the controversy here is in the nature of a boundary dispute, and we examine the rules governing such disputes.

"In a case of disputed boundary the parties may agree upon a line, by way of compromise, and if they take and hold possession up to that line the requisite statutory period, the mere possession will in time ripen into a title. But no mere parol agreement to establish a boundary, and thus exclude from the operation of a deed land embraced therein, can divest, change, or affect the legal rights of the parties growing out of the deed itself." *Suttle* v. *R. F. & P. R. R. Co.*, 76 Va. 284, 287 (1882).

"These instructions . . . amounted to saying to the jury that acquiescence or verbal acknowledgment or agreement as to the location of a disputed boundary could, *proprio vigore*, pass title from one man and vest it in another. Such is not the law. Acquiescence and admissions as to boundaries . . . are not in themselves independent sources of title." *Cox* v. *Heuseman*, 124 Va. 159, 166, 97 S.E. 778, 780 (1919).

*See also Wade* v. *Ford*, 193 Va. 279, 68 S.E.2d 528 (1952).

While we recognize, as appellees say, that the rules governing boundary disputes do not control the instant case, we find the analogy persuasive. Just as acknowledgments as to the location of a disputed boundary cannot constitute independent sources of title, so a mistaken belief that a plat "accurately pictured the pin placements" cannot. We hold that, in disputes among purchasers of lots shown on a plat, the metes and bounds established by accurate survey and corresponding calls of courses and distances noted on the plat supersede pictorial errors in the plat and control the dimensions and configurations of the lots.[1] Under such circumstances, a mistake of fact among purchasers resulting from pictorial errors does not justify a judicial reformation which alters the sizes and shapes of the lots fixed by the survey.

---

[1] Application of this rule is reinforced when, as here, the survey has been accurately marked on the ground, the purchasers have observed the pins on the ground before the purchase, and the purchasers have used and improved their land after the purchase in compliance with those monuments.

The chancellor did not err in denying appellees' prayer for reformation, and as to that ruling, the decree will be affirmed.

■ We turn now to the question whether the chancellor's finding of a mutual "understanding" among the three original purchasers is supported by the evidence. We do so with the rule in mind that a chancellor's findings based upon conflicting evidence heard *ore tenus* "will not be disturbed unless plainly wrong or without evidence to support them." *Alls* v. *Alls*, 216 Va. 13, 14, 216 S.E.2d 16, 17 (1975).

The three original purchasers testified at length. The transcript of the interrogation and responses of Brainerd and Gormly is devoid of any mention of the "understanding". In support of the chancellor's finding, appellees relied on brief and at bar upon certain extracts from Dickinson's testimony which are set out in the margin.[2] From these extracts, it appears that Dickinson chose Site C because he did not like Site A and because he concluded that the configuration of Site B would not accommodate a house near the water and, thus, would afford

---

[2] ". . . I selected site C for the following reasons: Number one, Doctor Brainerd had already made known a desire for site B, and in looking at site A I did not like the fact that it falls off rather abruptly to the north. Site C appeared more symmetrical to me and it was primarily because I very carefully measured with a ruler some time and again the distances between those two pins located near the water, and according to my estimates it was seventy-seven feet. According to my estimates the distance between the pins on the water, by my measurements, was approximately a hundred and twenty feet. . . . Knowing there was a twenty-foot setback on the side, which I was aware of, I knew that a house could not be built on site B. That this would allow only thirty-seven feet according to my calculations, which would preclude, really, anyone from building a house which would affect my view of the water.

". . . .

"We walked over the property and we identified the pins. . . . We may have walked off certain aspects of the property along the water. I don't recall. We may have, but that was never taken into consideration by me as relating to the plat, which I relied on to the fullest extent. . . .

". . . .

"As I recall, we walked around the property, the three of us, one day and — trying to reach an agreement on what each of us would pay and which lot we would like to have. And, if my memory serves me correctly, site B was the least expensive, which seemed to be very reasonable to me because of the shape of it and the narrow waterfrontage. Site A had the most waterfront property — approximately two hundred feet, as I recall, which was the most expensive. Site C was in the middle. . . . [F]eeling that a building could not be erected in the narrow part of site [B] . . . I increased the amount of money I paid for site C . . . I went up on my purchase price as did Doctor Brainerd and, as I recall, Mr. Gormly's price came down as a percentage of the total purchase.

". . . .

"[M]y primary decision was based on a measurement of the plat with a ruler."

Site C an unobstructed view of the lake. Manifestly, his conclusion was based upon the pictorial error in the plat, the measurements he made upon the face of the plat, and the setback requirements. Nowhere in the quoted excerpts or elsewhere in his testimony did Dickinson say that the other two purchasers reached a similar conclusion or that there was a *mutual* "understanding" that no building could or would be erected on the waterfront portion of Site B.

Hence, insofar as the testimony of the three purchasers reveals, the "understanding" was wholly unilateral.

But appellees rely further upon certain testimony of P. G. Denman, the attorney who handled the closing of the transaction. A fair construction of this testimony, which is quoted in the margin,[3] is that Denman formed a personal impression that the three purchasers had a general understanding that Site B was too narrow near the waterfront to accommodate a dwelling. But, qualifying the account of his own recollection and tacitly conceding that his impression was no more than an impression, Denman acknowledged that he could not speak for the parties themselves. Yet, as we have said, when the three purchasers spoke for themselves, none, including Dickinson, testified that there was a mutual "understanding" such as Denman recalled.

Accordingly, we hold that the chancellor's finding of a mutual "understanding" is without evidence to support it. Since that finding was the predicate for the order imposing the restriction on the face of the corrected plat and the corollary injunction, the final decree will be reversed *pro tanto.*

█ We find no merit in appellant's challenge to the apportionment of costs below, but costs on appeal will be assessed against appellees.

█ The cause is remanded for the entry of a new decree. The new decree will dissolve the injunction, vacate so much of the

---

[3] ". . . I think everybody understood — or it seemed to me at that time that everybody understood that there was no way that Doctor Brainerd could build the home down on the narrow neck of land leading down to the water. It was agreed by all, as I recall it, that if he was to build, he would have to build back on the larger area of the lot, and I think that was a major consideration in his mind, although I can't speak for him, and in both Mr. Gormly's and Mr. Dickinson's mind. Again, I can't speak for them, but as I understood it, they were able to assure themselves that they could build closer to the water and have an unobstructed view of Crystal Lake."

final decree and the December 12, 1975 decree as pertains to a restriction on the corrected plat, and instruct the clerk to enter upon the margin of Map Book 112, page 33, a notation referring to the new decree and declaring that the restriction shown on the corrected plat is null and void.

*Affirmed in part, reversed in part and remanded.*